UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
KARL CRONIN *also known as* KARL O'CONNOR,

                     Petitioner,

        v.

JEFF CHABROWE,

                    Respondent.
-------------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

25-MC-2379
(Merle, J.)
(Marutollo, M.J.)

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

      This miscellaneous action stems from an ongoing criminal action against Petitioner Karl

Cronin, also known as Karl O'Connor ("Cronin") for an alleged money laundering conspiracy (the

"Criminal Action"). *See* Dkt. No. 1; *see also United States v. Cronin*, No. 24-CR-303 (NCM)

(E.D.N.Y. 2024), Dkt. No. 1 ("No. 24-CR-303"). On June 12, 2025, after pleading guilty to the

sole count of the indictment in the Criminal Action, Cronin filed a letter seeking "disgorgement"[1]

of fees paid to Respondent Jeff Chabrowe, ("Chabrowe") his former counsel, for the representation

provided in connection with that matter. No. 24-CR-303, Dkt. No. 38. On June 13, 2025, the

Honorable Natasha C. Merle, United States District Judge, directed the Clerk of the Court to open

---

[1] "[D]isgorgement is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions." *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011). Thus, "'disgorgement' is not available primarily to compensate victims," *S.E.C. v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006), because an "order of disgorgement forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court, even if it exceeds actual damages to victims." *Id.*; *see S.E.C. v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987) ("[T]he primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched."). The Court will therefore refer to Cronin's request as one to remit or forfeit the attorneys' fees he paid to Chabrowe. *See, e.g., Garcia v. Teitler*, No. 04-CV-832 (JG), 2004 WL 1636982, at *8 (E.D.N.Y. July 22, 2004) (referring to similar request as one to remit the paid attorneys' fees), *aff'd*, 443 F.3d 202 (2d Cir. 2006); *Chen v. LJC Trading New York, Inc.*, No. 19-CV-3276 (SJF) (AKT), 2020 WL 10574176, at *3 (E.D.N.Y. Nov. 20, 2020) (referring to similar request as one for forfeiture of attorneys' fees).

the current miscellaneous action to resolve Cronin's request.  No. 24-CR-303, Text Order dated June 13, 2025.

Presently before the Court, on referral from Judge Merle, is Cronin's motion "seeking disgorgement of the entire $35,000 legal fee paid to [Chabrowe] on the ground that [Chabrowe's] representation was terminated for cause[.]"  Dkt. No. 2 at 1;[2] Referral Order dated June 16, 2025; *see generally* Dkt. No. 1.  Chabrowe opposes Cronin's request.  Dkt. No. 4.  For the reasons that follow, the undersigned respectfully recommends that the Court deny Cronin's motion.

## I.    <u>Background</u>

### A.    **The Indictment and Arraignment**

The Court presumes familiarity with this action and the Criminal Action and recounts only those facts pertinent to the instant dispute.

On November 25, 2024, an indictment against Cronin was unsealed, (No. 24-CR-303, Dkt. No. 4), alleging his participation in a conspiracy "to launder funds that were represented to be proceeds of securities fraud through bank accounts outside the United States."  No. 24-CR-303, Dkt. No. 1 at ¶ 3.  After being extradited from Hungary and arrested on the charges in the indictment (Dkt. No. 4 at 1), Cronin was arraigned before the Honorable James R. Cho, United States Magistrate Judge, wherein Cronin pled not guilty.  No. 24-CR-303, Dkt. No. 5.  The Court entered an order of detention against Cronin.  No. 24-CR-303, Dkt. No. 7.

### B.    **Cronin's Relevant Medical History**

Concurrent with Cronin's arraignment and order of detention, Judge Cho issued a medical order informing Metropolitan Detention Center Brooklyn ("MDC") that Cronin ██████████ ████████████████████████████████████████████  Judge Cho directed that Cronin

---

[2] Page citations are to the ECF-stamped page numbers.

"be evaluated for these conditions" ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

On December 18, 2024, Chabrowe entered a notice of appearance, as a retained attorney, for Cronin.  No. 24-CR-303, Dkt. No. 13; *see also* Text Order, dated May 9, 2025.

Chabrowe represents that Cronin's health issues quickly surfaced after assuming representation.  Dkt. No. 4 at 2.  In addition to those ailments flagged in the Court's medical order and the health evaluation, Chabrowe advises that Cronin also suffered from "severe dental problems" including "severe gingivitis[] and gum bleeding on contact," a "pruritic skin rash," a host of skin lesions on various places of his body, and "an infected abscess" that antibiotics "were not alleviating[.]" *Id.*

After Cronin was detained at MDC, Chabrowe contends that Cronin "submitted sick call requests stating that he had 'very bad pain' in his upper right tooth." *Id.*  Cronin was apparently then "told he would be placed on dental sick call" where "he could buy Tylenol," and later was "offered an extraction." *Id.*  Cronin, however, expressed to Chabrowe ███████████████████

████████████████████████████████████████████████ ██ ███

Thereafter, Chabrowe represents that he attempted to contact MDC concerning Cronin's ailments, but that "[e]mails sent by [his] office were unanswered" and that "[s]everal of [Cronin's] appointments were cancelled due to lock-down." *Id.* at 2-3.

On January 31, 2025, after Cronin had allegedly not been seen by a doctor despite having reported that the pain impeded his abilities to sleep and eat, Chabrowe filed a letter-motion in the

───────────────

█ ████████████████████████████████████████████████████

Criminal Action "asking the Court to assist with obtaining a dental consultation for [Cronin] with an outside dentist." *Id.* at 3; *see also* No. 24-CR-303, Dkt. No. 15.

On February 3, 2025, the Court directed the Government "to confer with the MDC regarding the medical concerns raised in [Cronin's] motion for medical treatment." No. 24-CR-303, Text Order dated Feb. 3, 2025. After the Government responded to Cronin's request, the Court denied Cronin's request without prejudice and ordered that the Government "advise the MDC that it must allow [Cronin] to see the MDC's second dentist to advise on a proposed course of action." No. 24-CR-303, Text Order dated Feb. 6, 2025.

On February 19, 2025, Chabrowe again filed a letter requesting medical assistance from the Court after Cronin reported that "he had not been provided his antiviral medications for ten days." Dkt. No. 4 at 3; No. 24-CR-303, Dkt. No. 18. The Court ordered the Government "to confer with the MDC regarding the medical concerns raised" by Cronin and to file a response by February 20, 2025. No. 24-CR-303, Text Order dated Feb. 19, 2025. Chabrowe contends that "[i]n email communication, the [G]overnment claimed that [Cronin] had not timely requested his medications be refilled." Dkt. No. 4 at 3. Chabrowe continues that the issue nonetheless was thereafter resolved through "numerous emails with [MDC's] staff over the issue" and that "[Cronin] was in possession of his medications." *Id.*

Between February 19, 2025 through March 19, 2025, Chabrowe states that Cronin's health "was again *in extremis* due to his skin condition." *Id.* Chabrowe claims that MDC "did not provide treatment other than refer [Cronin] for 'anxiety treatment.'" *Id.*

Chabrowe represents that on March 19, 2025, he "emailed the government and requested a consultation" for Cronin to "see a dermatologist." *Id.* MDC purportedly responded to Chabrowe's email by stating that Cronin "had not requested medical service," to which Chabrowe

4

responded that he understood that Cronin had in fact requested medical service but that he had "only been prescribed Prozac and told the lesions were from [Cronin] anxiously scratching himself." *Id.* Chabrowe asserts that he then had a telephone conversation with a representative of MDC, where he claims he attempted to convey the severity of Cronin's ailments to MDC's staff. *Id.* Chabrowe asserts that it was from that conversation with MDC that "this situation arose." *Id.*

### C.    MDC's Letter

On April 7, 2025, the Court entered an order acknowledging receipt of a letter from MDC, filed under seal, "concerning potential attorney misconduct" from Chabrowe, as Cronin's defense counsel, in the Criminal Action.  No. 24-CR-303, Text Order dated Apr. 7, 2025.  That letter, which was unsealed in the Criminal Action on May 21, 2025 (No. 24-CR-303, Text Order dated May 21, 2025), outlined a series of events concerning actions by the parties, Cronin's medical condition, and certain photographs sent from a potentially contraband cellphone.  No. 24-CR-303, Dkt. No. 33.  Specifically, the letter details multiple conversations between MDC's staff and Chabrowe regarding Cronin's medical condition, where Chabrowe informed the staff that "'[Cronin] sent [Chabrowe] photographs' of himself that Chabrowe acknowledged he 'should not have,' and further offered to forward them to [MDC]."  *Id.* at 1-2.

Chabrowe's conversations with MDC's staff "led [MDC] to believe [Cronin] was in possession of a contraband cellphone," given that "[MDC] does not provide detainees with any equipment that would enable them to take or send photographs from inside of the institution[.]" *Id.* at 2.  MDC staff then interviewed Cronin, where he denied possession of any contraband cellphone.  *Id.*

Shortly after the conclusion of Cronin's interview with MDC, Chabrowe purportedly again contacted MDC's staff "to express his discontent with the information he received."  *Id.* at 3.

Chabrowe further "defend[ed] the use of contraband the use of contraband cellphones," and did not deny his earlier statements as to the existence of the photographs that Cronin sent.  *Id.*

### D.    Subsequent Events and the Plea in the Criminal Action

In light of MDC's letter, the Court ordered that the parties "advise the Court whether the issues discussed therein pertain to any matter relevant before the Court in this case, including, but not limited to, potential implications pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), in a joint letter by April 14, 2025."  No. 24-CR-303, Text Order dated Apr. 7, 2025.

At the same time, and throughout the course of Chabrowe's representation, Cronin timely made all retainer payments for Chabrowe's representation.  *See id.* at 2; Dkt. No. 4 at 5.  Cronin's final payment to Chabrowe was on April 15, 2025—after the issues that arose from Chabrowe's conversations with MDC.  Dkt. No. 4 at 5.

On April 17, 2025, Chabrowe filed his response to the Court's order to show cause.  No. 24-CR-303, Dkt. No. 26.  Following that submission, the Court scheduled a *Curcio* hearing in light of its findings "that the issues raised in the MDC's letter present a potential conflict of interest."  No. 24-CR-303, Text Order dated Apr. 24, 2025.

On May 5, 2025, Cronin filed a *pro se* letter requesting, *inter alia*, that Chabrowe be relieved as his counsel in the Criminal Action and be refunded the "$35,000 fee paid to him for legal services[.]"  No. 24-CR-303, Dkt. No. 31 at 1.  The Court, upon receipt of Cronin's letter, converted the *Curcio* hearing to a status conference to discuss his requests.  No. 24-CR-303, Text Order dated May 6, 2025.

On May 8, 2025, the Court held the conference concerning Cronin's requests in his *pro se* letter.  No. 24-CR-303, Minute Entry dated May 8, 2025.  At the conference, the Court granted Cronin's request to relieve Chabrowe as his counsel of record and appointed Criminal Justice Act

("CJA") counsel—Gary Farrell, Defendant's current attorney—to represent him moving forward in the Criminal Action.  *Id.*  The Court further denied Cronin's request for forfeiture with leave to renew.  *Id.*

On June 11, 2025, Cronin pled guilty to the sole charge of money laundering conspiracy in violation of 19 U.S.C. §§ 1956(h) and 3551 *et seq.* in the indictment.  No. 24-CR-303, Minute Entry dated June 11, 2025.  His sentencing is set for October 1, 2025.  *Id.*

### E.      Cronin's Motion

On June 12, 2025, Cronin filed the present motion in the Criminal Action.  No. 24-CR-303, Dkt. No. 38.  The Court ordered the Clerk of the Court to "open a new miscellaneous action concerning the attorneys' fees dispute," with Cronin as a plaintiff represented by CJA counsel, and Chabrowe as defendant (effectively appearing *pro se* on his behalf).  No. 24-CR-303, Text Order dated June 13, 2025.  The instant action was opened that same day, with the motion re-docketed under seal pursuant to Judge Merle's direction.  *See id.*; *see also* Dkt. No. 1.

Cronin requests that the Court "accept ancillary jurisdiction over this dispute" based on the reasoning of *Garcia v. Teitler*, 2004 WL 1636982.  *See* Dkt. No. 1 at 1.

Concerning the merits of his motion, Cronin first challenges the validity of the retainer agreement he signed with Chabrowe.  Dkt. No. 1 at 2.  Cronin notes that "neither he nor his authorized representative, Paul Hatton, signed a retainer agreement with [Chabrowe], who was recommended by another inmate."  *Id.*  Rather, Cronin states that although Hatton provided him with the agreement—addressed to Cronin's legal name[4]—the "third page of the client's name below the signature space appears as 'Michelle Curtis,'" which Cronin claims was "likely an error

---

[4]  Cronin states that the retainer agreement provided to him by Chabrowe was addressed to "Jonathan Carson," which is his legal name.  Dkt. No. 1 at 2.  Cronin notes that his name "was formerly Karl Cronin, but he changed it several years ago."  *Id.*

on [Chabrowe's] behalf." *Id.*; *see id.* at 6 (containing copy of the retainer agreement). Despite that Mr. Hatton "never signed the agreement, [Cronin and Hatton] nonetheless honored all [the retainer agreement's] terms paying [Chabrowe] the entire $35,000 in a timely manner." *Id.*

With respect to the legal work performed by Chabrowe, Cronin asserts that Chabrowe's actions during the course of representation in the Criminal Action "violated the attorney-client privilege and subjected [Cronin] to the possibility of an increased sentence" through Chabrowe's conversations with MDC's staff. *Id.* at 2. Those conversations, concerning Cronin's alleged use of a contraband cellphone, placed Cronin "at significant risk" of facing prosecution for violations to which Chabrowe "may be a witness" or otherwise "called to testify regarding his receipt of communications from [Cronin] using a contraband cellphone." *Id.* Cronin continues that Chabrowe's behavior "could be misconduct constituting 'cause' for his discharge and could result in full disgorgement of all [legal] fees paid." *Id.*

Cronin concedes that Chabrowe "did some work on [Cronin's] behalf," including Chabrowe "visit[ing] [Cronin] multiple times at MDC." *Id.* Cronin contends, however, that these visits "were short and not very informative." *Id.* Cronin offers specific examples of Chabrowe's purported deficient representation, including failures to discuss "the charge contained in the indictment at length with [Cronin]" or "anything about Rule 16 discovery," as well as noting that he does not recall "seeing [Chabrowe] with an indictment during these visits." *Id.* at 2-3. Cronin further represents that ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████

The motion further touches on the parties' differences in strategies for approaching the Criminal Action. *See id.* ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████  In response, Chabrowe allegedly insisted that "everything will be fine," although "no such assurance was ever provided in writing as [Cronin] requested." *Id.*

Chabrowe opposes Cronin's motion.  *See generally* Dkt. No. 4.  Chabrowe contends that he "did not create a situation where [Cronin's] interests were *materially* adverse to [his] own." *Id.* at 7 (emphasis in original).  Chabrowe maintains that any federal prosecution for a contraband cellphone at MDC would be "virtually impossible" under the facts because Cronin "did not possess one," as "[n]one was found on him or in his property." *Id.*  Rather, Chabrowe asserts that the issues arising from his conversations reflect "vigorous representation of Cronin" due to his ongoing medical conditions. *Id.*  Chabrowe further argues that refunding the attorneys' fees is not warranted because he "expended significant effort" in representing Cronin, that the retainer is valid and binding despite the absence of Cronin's signature, and that there was no ineffective assistance of counsel or termination for cause. *Id.* at 7-9.

## II.    <u>Jurisdiction</u>

"'It is well settled that a federal court may, in its discretion, exercise ancillary jurisdiction to hear fee disputes . . . between litigants and their attorneys when the dispute relates to the main action.'" *Levitt v. Brooks*, 669 F.3d 100, 103 (2d Cir. 2012) (quoting *Chesley v. Union Carbide Corp.,* 927 F.2d 60, 64 (2d Cir. 1991)); *Innovative Biodefense, Inc. v. VSP Techs., Inc.*, No. 12-CV-3710 (ER), 2020 WL 2317446, at *4 (S.D.N.Y. May 11, 2020) ("Whether this Court exercises

supplemental jurisdiction over those principally state law claims, however, is a decision submitted to the Court's sound discretion."). "Ancillary jurisdiction over fee disputes is equally available in criminal and civil cases." *Levitt*, 669 F.3d at 103 (citing *Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006)). "[T]he Supreme Court has instructed that ancillary jurisdiction may be exercised 'for two separate, though sometimes related, purposes: (1) to permit disposition of claims that are, in varying respects and degrees, factually interdependent by a single court, and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.'" *Garcia*, 443 F.3d at 208 (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 379 (1994)); *see also Taxis for All Campaign v. New York City Taxi & Limousine Comm'n*, No. 11-CV-237 (GBD), 2024 WL 4007963, at *4 (S.D.N.Y. Aug. 29, 2024) ("Ancillary jurisdiction also enables district courts to resolve requests for attorneys' fees." (citing *Kaplan v. Reed Smith LLP*, 919 F.3d 154, 157 (2d Cir. 2019))).

The United States Court of Appeals for the Second Circuit has articulated four factors to guide a Court in deciding whether to exercise ancillary jurisdiction over a fee dispute: "(1) the trial court's familiarity with the subject matter of the suit and the work performed by the law firm in connection with the lawsuit; (2) the Court's responsibility to protect its own officers in such matters as fee disputes; (3) the convenience of litigating in federal court as opposed to state court; and (4) considerations of judicial economy." *Burdick v. Town of Schroeppel*, No. 16-CV-01393 (MAD) (TWD), 2017 WL 5509355, at *22 (N.D.N.Y. Jan. 31, 2017) (citing *Cluett, Peabody & Co. v. CPC Acquisition Co.*, 863 F.2d 251, 256 (2d Cir. 1988)), *report and recommendation adopted*, 2017 WL 1284864 (N.D.N.Y. Apr. 6, 2017), *aff'd in part*, 717 F. App'x 92 (2d Cir. 2018); *see Garcia*, 2004 WL 1636982, at *4 (articulating same); *see also Davis v. Espinal-Vasquez*, No. 21-CV-7819 (KMK), 2024 WL 1194715, at *2 (S.D.N.Y. Mar. 20, 2024) (setting

forth the factors).  At bottom, "'ancillary jurisdiction is aimed at enabling a court to administer justice within the scope of its jurisdiction.'"  *Stein v. KPMG, LLP*, 486 F.3d 753, 760 (2d Cir. 2007) (quoting *Garcia*, 443 F.3d at 208); *Burdick*, 2017 WL 5509355, at *22 ("Additionally, courts have emphasized that, before exercising ancillary jurisdiction, [m]ost important, [a court] must determine whether the exercise of jurisdiction is necessary to provide a fair resolution of the underlying matter, and to allow the court to administer its proceedings." (internal quotations and citations omitted)).

As a preliminary matter, the undersigned recommends a finding that the Court possesses jurisdiction over the instant dispute.  The factors articulated in *Cluett* favor the Court exercising ancillary jurisdiction over the fee dispute between the parties.  First, familiarity with the subject matter of the present suit favors ancillary jurisdiction, as the legal work performed in the Criminal Action—forming the basis for Cronin's motion—occurred before the Court.  That familiarity would result in a rapid and efficient disposition of the motion, avoiding the delays associated with an unconnected state court needing to familiarize itself with the two actions to render a dispositive decision.  Indeed, a district court's familiarity with the suit giving rise to the ancillary proceeding lends support to the exercise of jurisdiction because "familiarity with the amount and quality of work performed by [counsel] would enormously facilitate rapid disposition of a fee dispute, while a great deal of the record would have to be considered anew and relitigated in a state court unfamiliar with the proceedings."  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 336 (2d Cir. 2006) (citing *Cluett*, 863 F.2d at 256).

Moreover, the present matter is undoubtedly factually intertwined with the Criminal Action over which the Court possesses original jurisdiction.  *See Garcia*, 443 F.3d at 208.  Cronin seeks a refund of attorney fees he paid for Chabrowe's representation in the Criminal Action, and the

two parties to this action were involved in that matter.  *See* Dkt. No. 1 at 1-3; Dkt. No. 4 at 1-7; *see Brettschneider v. City of New York*, No. 15-CV-4574 (CBA) (SJB), 2020 WL 5984340 (E.D.N.Y. Aug. 25, 2020) ("Cases involving the exercise of ancillary jurisdiction for a fee dispute usually involve at least one party to the litigation, *i.e.* the dispute is between a party and his or her attorney about the fees to be paid"), *report and recommendation adopted*, 2020 WL 5981681 (E.D.N.Y. Oct. 8, 2020); *Cluett*, 863 F.2d at 256 (finding the district court's exercise of ancillary jurisdiction over fee dispute with a party and its counsel was "well within its discretion").  Courts in this Circuit routinely exercise ancillary jurisdiction to resolve similar disputes under similar circumstances.  *See, e.g.*, *Brettschneider*, 2020 WL 5984340, at *6 (collecting cases); *Garcia*, 2004 WL 1636982, at *4-*5 (exercising ancillary jurisdiction over fee dispute between criminal defendants and their attorney); *Doe v. United States*, No. 19-CV-1239 (KAM) (PK), 2024 WL 1577926, at *3 (E.D.N.Y. Apr. 11, 2024) (finding ancillary jurisdiction over fee dispute client and attorneys); *see also Levitt*, 669 F.3d at 103 ("[E]ven though attorneys' fees arrangements are primarily a matter of state law, the federal forum has a vital interest in those arrangements because they bear directly upon the ability of the court to dispose of cases before it in a fair manner." (internal quotations and citations omitted)).

Accordingly, the undersigned respectfully recommends that the Court has jurisdiction to issue a decision on Cronin's motion.

## III.    **The Merits**

### A.    **The Retainer Agreement Is Valid And Binding**

Under New York law,[5] it is "axiomatic" that "the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties."  *Lockheed Martin Corp.*

---

[5]  Pursuant to the choice of law provision in the retainer agreement, *see* Dkt. No. 1 at 6 ("The terms and provisions of this Retainer Agreement shall be construed and governed in accordance with the laws of the

*v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).  An unsigned contract, including a retainer agreement, "may be enforceable where objective evidence establishes the parties' agreement to, and intent to be bound by, its terms."  *Kimm v. Kyu Sung Cho*, 706 F. App'x 1, 2 (2d Cir. 2017); *Hong v. Mommy's Jamaican Mkt. Corp.*, No. 20-CV-9612 (LJL), 2024 WL 3824394, at *8 (S.D.N.Y. Aug. 14, 2024) (enforcing unsigned retainer agreement).  "Partial performance by one party and the acceptance of such performance by another can satisfy this requirement."  *Kimm*, 706 F. App'x at 2 (citing *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984)); *cf. Laborers' Int'l Union of N. Am. Loc. 91 v. Insulation Coatings & Consultants LLC*, No. 20-CV-1586 (JLS) (LGF), 2023 WL 10368100, at *3 (W.D.N.Y. Oct. 17, 2023) (finding unsigned collective bargaining agreement enforceable under the standard set in *Kimm*), *report and recommendation* 2024 WL 1096116 (W.D.N.Y. Mar. 13, 2024); *CoraMed USA, LLC v. Alexion Pharms., Inc.*, 695 F. Supp. 3d 251, 263-64 (E.D.N.Y. 2023) (enforcing unsigned purchase agreement under the same standard).

Here, the undersigned respectfully recommends that the retainer agreement, providing for Chabrowe's legal representation of Cronin in the Criminal Action, be found valid and enforceable. Although it is undisputed that neither Cronin nor his representative actually signed the agreement, *see* Dkt. No. 1 at 2; *id.* at 6; Dkt. No. 4 at 8, Cronin accepted Chabrowe's legal work on his behalf throughout the course of the Criminal Action.  *See generally* No. 24-CR-303.  As conceded by Cronin, Chabrowe represented Cronin without issue "for several months" in the Criminal Action, where he attempted to communicate Cronin's medical conditions to MDC's staff on multiple

---

State of New York"), New York law governs construction and interpretation of the validity of the agreement.  *See Judd Burstein, P.C. v. Long*, 180 F. Supp. 3d 308, 311 n.2 (S.D.N.Y. 2016) (applying New York law to dispute of legal fees arising out of retainer agreement because of the choice of law provision in the contract).  Moreover, neither party disputes the applicability of New York law to the instant portion of Cronin's motion.

occasions, completed work on Cronin's behalf, met with Cronin "multiple times at MDC," attended "three proffer sessions with [Cronin]," and advised Cronin of case management strategies. Dkt. No. 1 at 1-3. In exchange, Cronin "honored all [the retainer agreement's] terms paying [Chabrowe] the entire $35,000 in a timely manner." *Id.* at 2.

In light of the parties' representations in their filings, both Cronin and Chabrowe demonstrated acceptance of the retainer agreement and their intent to be bound by its terms. *See Kimm*, 706 F. App'x at 3 (finding unsigned retainer agreement binding based on partial performance of the contract's terms).

Accordingly, the undersigned respectfully recommends that the record establishes that the retainer agreement is binding and enforceable.

### B.    Forfeiture Is Not Warranted

#### 1.    Chabrowe Was Not Discharged For Cause[6]

In his motion, Cronin asserts that Chabrowe "could be" liable for misconduct "constituting 'cause' for his discharge and could result in full disgorgement of all fees paid." Dkt. No. 1 at 2. "Under New York law, a client may discharge his or lawyer at any time, with or without cause." *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 262 (2d

---

[6] The undersigned respectfully recommends that an evidentiary hearing is not necessary here to resolve the matter. Although "[g]enerally, a hearing is required to determine if an attorney was discharged for cause," *see El Nabi v. City of New York*, No. 21-CV-3768 (LAK) (JW), 2025 WL 1172244, at *5 (S.D.N.Y. Apr. 22, 2025), courts in this Circuit "routinely decline to hold such a hearing" when presented with detailed submissions that do not give rise to disputes over relevant facts. *Id.*; *Schreiber v. Friedman*, No. 15-CV-6861 (CBA) (CLP), 2022 WL 669461, at *7 (E.D.N.Y. Mar. 7, 2022) ("Where the facts are disputed, an evidentiary hearing should generally be held to determine whether an attorney was discharged for cause."); *Ramgoolie v. Ramgoolie*, No. 16-CV-3345 (VEC) (SN), 2020 WL 6135056, at *2 (S.D.N.Y. Oct. 16, 2020) (collecting cases). Here, the parties' submissions and the Court's familiarity with the underlying conduct in the Criminal Action do not necessitate an evidentiary hearing, as the submissions before the Court do not raise any dispute of determinative fact. *See El Nabi*, 2025 WL 1172244, at *5; *see also Kovach v. City Univ. of New York*, No. 13-CV-7198 (LGS), 2015 WL 3540798, at *6 (S.D.N.Y. June 4, 2015) (declining to hold evidentiary hearing on whether the attorney was discharged for cause because the record was sufficient). Moreover, even accepting as true all of Cronin's allegations yields the same result in this Report & Recommendation.

Cir. 2004). "[A]n attorney who has been discharged without cause is entitled to be paid a fee on a *quantum meruit* basis for the reasonable value of the legal services that were provided." *Stair v. Calhoun*, 722 F. Supp. 2d 258, 277 (E.D.N.Y. 2010). An attorney discharged for cause, however, "is not entitled to legal fees." *Quadrino*, 370 F.3d at 263; *Stair*, 722 F. Supp. 2d at 277 ("[A]n attorney who has been discharged for cause has no right to compensation or a retaining lien[.]").

"Courts typically find a discharge 'for cause' where there has been a significant breach of a legal duty." *Chen*, 2020 WL 10574176, at *5 (quoting *Antonmarchi v. Consol. Edison Co. of New York*, 678 F. Supp. 2d 235, 241 (S.D.N.Y. 2010)). "The client must show that [his] former attorney's conduct 'constituted a failure to properly represent [his] interests[.]'" *Love & Madness, Inc. v. Claire's Holdings, LLC*, No. 21-CV-1913 (SLC), 2022 WL 5138806, at *4 (S.D.N.Y. Oct. 5, 2022) (quoting *Costello v. Kiaer*, 278 A.D.2d 50 (N.Y. App. Div. 2000)).

Courts in this District have found that a client meets the "for cause" standard when one or more of the following is shown:

> (1) the attorney's failure to perform under the employment contract; (2) his lack of diligence in so performing; (3) his lack of ordinary skill or care in so performing; (4) his making of demands on the client which violate the terms or exceed the scope of the contract; (5) his taking of actions contrary to the client's interests or objectives; (6) his indulging in some sort of unprofessional conduct while handling the client's affairs; (7) his venting of personal or economic hostility toward the client; and (8) his loss of the client's trust and confidence.

*Chen*, 2020 WL 10574176, at *5-*6 (quoting *Holcombe v. US Airways Grp., Inc.*, No. 08-CV-1593 (SLT) (JO), 2017 WL 10084142, at *10-*11 (E.D.N.Y. Aug. 4, 2017)). Other Courts in New York have found discharges "for cause" to include: "commencement of unnecessary litigation; engagement in unnecessary motion practice; substantial delay in prosecuting a case; and a conflict of interest," *Garcia*, 2004 WL 1636982, at *6 (internal citations omitted) (collecting cases and surveying law), as well as "situations where counsel concealed information from their clients,

15

utilized abusive language, interfered with their clients' rights to settle, and threatened to improperly withdraw from the case." *Kamel v. Prisco*, No. 23-CV-00033 (JLR), 2025 WL 846135, at *4 (S.D.N.Y. Mar. 18, 2025).

A "for cause" discharge does not include, however, "[p]oor client relations, differences of opinion, or personality conflicts," *Garcia*, 443 F.3d at 212. Nor is cause shown where an attorney fails to be attentive and responsive to the client's inquiries concerning the progress of the case, *see, e.g.*, *Jeon v. Riley*, No. 18-CV-2612 (NGG) (PK), 2020 WL 9208777, at *3 (E.D.N.Y. Nov. 23, 2020), *report and recommendation adopted* 2021 WL 926086 (E.D.N.Y. Mar. 11, 2021), or where litigation strategies diverge between the parties. *Allstate Ins. Co. v. Nandi*, 258 F. Supp. 2d 309, 312 (S.D.N.Y. 2003). "It is the client's burden to establish that the attorney was discharged for valid cause." *Farb v. Baldwin Union Free Sch. Dist.*, No. 05-CV-0596 (JS) (ETB), 2011 WL 4465051, at *9 (E.D.N.Y. Sept. 26, 2011) (quoting *Garcia*, 443 F.3d at 212).

Here, Cronin has failed to carry his burden in showing that Chabrowe was terminated for cause warranting a refund of the attorneys' fees paid to Chabrowe in connection with the Criminal Action. Based upon review of the parties' submissions and the docket in the Criminal Action, the undersigned is not persuaded that Chabrowe's conduct during the course of Cronin's legal representation justifies granting Cronin's motion.

Both Cronin's and Chabrowe's submissions do not exhibit that Chabrowe failed to perform his obligations under the retainer agreement or lacked ordinary skill or care in effectuating Cronin's legal representation. Nor does Cronin's motion indicate that Chabrowe displayed any personal or economic animosity towards Cronin, threatened to withdraw from representation, concealed information from Cronin, or engaged in unnecessary and dilatory conduct in the scope of his duties. Rather, Chabrowe's performance throughout the Criminal Action, including the

16

communications with MDC's staff, suggest that Chabrowe executed his duties as Cronin's attorney with diligence and attention.  Although Cronin, in hindsight, might ultimately disagree with some of Chabrowe's strategies in litigating his case, "[e]vidence of a general dissatisfaction with an attorney's performance or a difference of opinion between attorney and client does not establish that the attorney was discharged for cause absent some evidence that the attorney failed to properly represent the client's interest."  *See Greenberg v. Cross Island Indus., Inc.*, 522 F. Supp. 2d 463, 467 (E.D.N.Y. 2007).

And contrary to Cronin's arguments (Dkt. No. 1 at 1-2), although Chabrowe's actions may arguably have been careless, they do not constitute discharge for cause.  Chabrowe's conversations with MDC's staff were made in Cronin's interests; namely, they were made in an attempt to secure Cronin with the necessary medical attention for the worsening of his physical ailments.  No. 24-CR-303, Dkt. No. 33 at 2 (noting that MDC was contacted by Chabrowe to discuss Cronin's skin condition and necessary medical care).  Further, when interviewed by MDC's staff on the suspicion of possession of contraband, Cronin denied possession, no contraband was found, and no further disciplinary or legal action ensued.  *Id.*  The allegations that Cronin violated any policies or laws were thus never substantiated, and there is no indication that Cronin has suffered adverse consequences as a result of Chabrowe's actions besides an initial interview.  *See* Dkt. No. 1 at 2-3.

Moreover, that Cronin continued payments to Chabrowe for legal representation after the incident with MDC's staff occurred weighs against a finding of discharge for cause.  Nothing before the undersigned suggests that Cronin only discovered Chabrowe's interactions with MDC's staff until after his final retainer payment on April 15, 2025.  Rather, MDC's letter illustrates that Chabrowe's conversations with MDC, including the possibility that Cronin sent photographs

17

through an illicit cellphone, were conveyed to Cronin that same day. No. 24-CR-303, Dkt. No. 33 at 2. Cronin's motion thus does not support an inference that Chabrowe concealed any adverse conduct against Cronin's interests while continuing to accept payment for legal representation, which could support a forfeiture of fee payments. *Cf. Coccia v. Liotti*, 70 A.D.3d 747, 757 (N.Y. App. Div. 2010) ("Misconduct that occurs before an attorney's discharge but is not discovered until after the discharge may serve as a basis for a fee forfeiture"); *Nabi v. Sells*, 70 A.D.3d 252, 253-54 (N.Y. App. Div. 2009) ("Against the client's unqualified right to terminate the attorney-client relationship is balanced the notion that a client should not be unjustly enriched at the attorney's expense or take undue advantage of the attorney, and therefore the attorney is entitled to recover the reasonable value of services rendered.").

Accordingly, the undersigned respectfully recommends that Chabrowe was not terminated for cause warranting a forfeiture of fees for the services he rendered in representing Cronin in the Criminal Action.

### 2.    No Violations Of Attorney-Client Privilege

Furthermore, Chabrowe's communications with MDC's staff did not violate the attorney-client privilege. Dkt. No. 1 at 2. "The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purposes of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). "In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017).

The party invoking the privilege "bears the burden of establishing its essential elements." *Mejia*, 655 F.3d at 86; *Oakley v. MSG Networks, Inc.*, No. 17-CV-6903, 2025 WL 307413, at *1 (S.D.N.Y. Jan. 27, 2025) (Sullivan, J.) ("The party asserting attorney-client privilege bears the burden of establishing that each of the three elements has been met and that the privilege has not been waived."). "Each attorney-client communication 'need not specifically ask for legal advice,' but the party asserting the privilege must first establish that 'the information is sent to counsel in order for counsel to provide legal advice.'" *Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 37-38 (E.D.N.Y. 2013) (quoting *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 01-CV-8854 (LTS) (THK), 2006 WL 1004472, at *4, *6-*7 (S.D.N.Y. Apr. 18, 2006)), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014).

Cronin cites, in a conclusory fashion, to a 2004 decision from this Circuit in support of his assertion that Chabrowe's "actions which violated the attorney-client privilege and subjected [Cronin] to the possibility of an increased sentence, could be misconduct constituting 'cause' for his discharge and could result in full disgorgement of all fees paid." Dkt. No. 1 at 2 (citing *Garcia*, 2004 WL 1636982, at *6). As discussed below, that decision is distinguishable. Moreover, Cronin fails to establish or even address any of the elements to show that Chabrowe's conduct violated the privilege. Cronin has thus failed to carry his burden of showing that the privilege applied for the purposes of his motion. *See Mejia*, 655 F.3d at 86; *Koumoulis*, 295 F.R.D. at 38 ("Any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege").

But even assuming the presence of the first two elements—that discussions between Cronin and Chabrowe surrounding potential photographs taken with a contraband cellphone in MDC were confidential—the communications were clearly not made for the purposes of obtaining or

providing legal advice. *In re Petition of OneTaste, Inc.*, No. 24-MC-02518 (DG) (RML), 2025 WL 1808724, at *6 (E.D.N.Y. July 1, 2025) ("Nothing in the record establishes that Petitioner has met its burden of demonstrating that [the pertinent document] enjoys the protection of the attorney-client privilege. To the contrary, the record reflects that Petitioner has fallen far short of establishing that any such document enjoys any such protection."). Whether communications between an attorney and a client satisfy the third element of the attorney-client privilege evaluates "whether the predominant purpose of the communication is to render or solicit legal advice," which often "involves the interpretation and application of legal principles to guide future conduct or to assess past conduct." *In re Cnty. of Erie*, 473 F.3d 413, 419-20 (2d Cir. 2007); *In re Aenergy, S.A.*, 451 F. Supp. 3d 319, 322 (S.D.N.Y. 2020). To be protected under the privilege, the communication must be "primarily or predominantly of a legal character[.]" *Shih v. Petal Card, Inc.*, 565 F. Supp. 3d 557, 566-67 (S.D.N.Y. 2021).

Here, discussions between the parties surrounding the photographs, which were then relayed to MDC's staff, did not concern legal advice in relation to the charges alleged against Cronin in the Criminal Action. Those communications instead pertained to Cronin's medical condition in an attempt to facilitate attention and treatment from MDC's medical staff. *See* Dkt. No. 1 at 1-2; Dkt. No. 4 at 3; No. 24-CR-303, Dkt. No. 33 at 2-3. Chabrowe's statements to MDC were thus not rooted in an attempt by him to provide legal advice, nor any attempt by Cronin to obtain legal advice, that may protect the communications under the ambits of the privilege. *See Cuomo v. Off. of New York State Att'y Gen.*, 754 F. Supp. 3d 334, 363 (E.D.N.Y. 2024) ("[s]o long as obtaining or providing legal advice was one of the significant purposes of the . . . investigation, the attorney-client privilege applies, even if there were also other purposes"). Indeed, courts in this Circuit are to "construe the privilege narrowly" given that it "protects *only* those disclosures

necessary to obtained informed legal advice which might not have been made absent the privilege." *Krug*, 868 F.3d at 86 (emphasis in original) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

To the extent that Cronin again relies on *Garcia v. Teitler* to justify his request for a refund of fees paid (*see* Dkt. No. 1 at 1-2 (citing 2004 WL 1636982, at *6); Dkt. No. 2 at 1 (same)), his attempt to analogize the case is unpersuasive. First, no attorney-client privilege was implicated in the court's decision to remit the attorneys' fees in *Garcia*. *See generally* 2004 WL 1636982. Second, the attorney's conduct in *Garcia* was so egregious that the court found it warranted his dismissal as counsel for cause. *Id.* at *7. Specifically, the Court centered its findings on the totality of the attorney's misconduct, which infected the case from the outset:

> [The attorney] persisted in his efforts to represent codefendants in a criminal case despite the obvious conflict of interest that created. Perhaps because he refused to acknowledge even a potential conflict, he made no effort to ensure that his clients knowingly or, with the slightest understanding, addressed that basic issue. [The attorney] also spent virtually no time discussing the facts of the case or a meaningful strategy with [the defendants], choosing instead to pronounce the government's case as "bullshit" and to demand a speedy trial, despite the fact that they were charged in a complex drug case involving over 2,000 tape-recorded conversations that [the attorney] had not reviewed. In short, [the attorney] spent his brief time on the case pursuing a strategy of joint representation that he foisted upon his clients. The strategy was doomed from its inception, harmful to both of his clients, and intended solely to increase [the attorney's] fee. [The attorney] misrepresented to his clients that: (1) the only chance that either had to avoid jail would be through joint representation; (2) there was no way he could lose the *Curcio* issue, either in the district court or in the court of appeals; (3) he would return one of his client's retainers if he lost the *Curcio* hearing; and (4) [one defendant] would be rearrested and remanded if she discharged him.

*Id.*

In contrast, as discussed above, Chabrowe's conduct does not establish that he was discharged for cause in the Criminal Action. And as noted below, no conflict exists between Cronin and Chabrowe given the speculative nature of Cronin's assertions.

Accordingly, the undersigned respectfully recommends a finding that no violations of the attorney-client privilege between Cronin and Chabrowe occurred in the Criminal Action.

### 3.    No Conflict of Interest Between the Parties Existed or Exists

Cronin's assertion that Chabrowe's communications with MDC's staff created a "potential conflict of interest" does not warrant remitting the fees he paid Chabrowe for legal representation. *See* Dkt. No. 1 at 2.  Cronin cites to a letter filed by the Government concerning potential *Curcio* issues in the Criminal Action that raises "the risk" and "the possibility" that Chabrowe may be called as a witness to Cronin's "use of contraband cellphones at the MDC." *Id.*  Cronin thus implicitly argues that Chabrowe should have been disqualified as his counsel after the events with MDC took place due to the potential conflict of interest should Cronin be charged with possession of a contraband cellphone.  Cronin asserts that Chabrowe should forfeit the attorneys' fees on that basis.

"The Sixth Amendment right to effective assistance of counsel 'generally ensures that an accused may be represented by any attorney who will agree to take his case.'" *United States v. Arrington*, 941 F.3d 24, 39 (2d Cir. 2019) (quoting *United States v. Perez*, 325 F.3d 115, 124 (2d Cir. 2003)).  "This right may be violated if the attorney has '(1) a potential conflict of interest that result[s] in prejudice to the defendant, or (2) an actual conflict of interest that adversely affect[s] the attorney's performance.'" *Perez*, 325 F.3d at 125 (quoting *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994)).  "An attorney has a potential conflict of interest if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.'" *Id.* (quoting *United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998)).

A court's obligation to investigate whether a conflict of interest exists that might disqualify counsel is triggered "only where the possibility of a conflict of interest is *sufficiently apparent—*

as opposed to where there is merely a vague, unspecified possibility of conflict or where, as a result of creative speculation, one could imagine that a conflict may have arisen." *United States v. Lemke*, No. 22-156, 2023 WL 192493, at *2 (2d Cir. Jan. 17, 2023) (quoting *United States v. Velez*, 354 F.3d 190, 198 (2d Cir. 2004)) (citation modified), *cert. denied*, 143 S. Ct. 2510 (2023).

Here, the purported conflict between the parties did not warrant disqualification. First, the letter filed by MDC in the Criminal Action conveys that the only action taken against Cronin due to possession of an alleged contraband cellphone was an interview with MDC's lieutenant. No. 24-CR-303, Dkt. No. 33 at 2. Indeed, Cronin denied possession of any cellphone, and MDC did not report that it actually found contraband in Cronin's possession. The letter does not suggest, nor does Cronin contend, that any further disciplinary action was taken against him. Nor has there been any indication that Cronin will be subject to additional criminal charges for possessing contraband under 18 U.S.C. § 1791 as a result of Chabrowe's conversation with MDC's staff. Thus, Cronin's contentions of a conflict appear to be precisely the "product of creative speculation" that does not give rise to a court's duty to investigate whether disqualification is warranted. *See Lemke*, 2023 WL 192493, at *2. Because Chabrowe's disqualification was not warranted, Cronin should not be able to recoup the fees he paid to Chabrowe for his representation in the Criminal Action.

Accordingly, the undersigned respectfully recommends that Cronin's motion that Chabrowe remit the attorneys' fees he was paid be denied.[7]

---

[7] Moreover, the attorney-client privilege cannot serve as "an immunity for corrupt or criminal acts." *Gilead Scis., Inc. v. Khaim*, No. 24-CV-4259 (NCM) (JAM), 2025 WL 1151412, at *6 (E.D.N.Y. Apr. 21, 2025) (citations omitted). The parties appear to concede that Cronin surreptitiously took photographs on a contraband cell phone in a prison; such behavior can arguably appear to be part of ongoing criminal or fraudulent conduct. *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15*, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984) (citations omitted); *see also Jeanty v. Bagley*, No. 6:22-CV-00319 (BKS) (TWD), 2025 WL 892691, at *5 (N.D.N.Y. Mar. 24, 2025) ("It is well-established that communications that otherwise would be protected by the attorney-client privilege . . . are not protected if they relate to client communications in

IV.   **Conclusion**

The undersigned therefore respectfully recommends that Cronin's request to recoup all fees paid to Chabrowe in connection with Chabrowe's legal representation of Cronin in the Criminal Action be denied.

A copy of this Report and Recommendation is being electronically served on counsel.

Any objections to this Report and Recommendation must be filed within 14 days after service of this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days).  Any requests for an extension of time for filing objections must be directed to Judge Merle.  Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); *Kotlyarsky v. United States Dep't of Just.*, No. 22-2750, 2023 WL 7648618 (2d Cir. 2023); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

Finally, this Report and Recommendation is filed under seal.  The parties are directed to confer regarding any proposed redactions to this Report and Recommendation, and by July 18, 2025, file a joint letter attaching the proposed redacted Report and Recommendation therewith and justifying such redactions under the standard articulated in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).

Dated: Brooklyn, New York
          July 14, 2025

**SO ORDERED.**

*s/ Joseph A. Marutollo*
JOSEPH A. MARUTOLLO
United States Magistrate Judge

---

furtherance of contemplated or ongoing criminal or fraudulent conduct." (citing *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984))).